U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 NOV 17  AM 10: 56

CLERK

BY [signature]
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| CARRIE E. ARCHAMBAULT, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner of Social Security, )<br>)<br>Defendant. ) | Case No. 2:15-cv-225 |

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE COMMISSIONER'S DECISION AND GRANTING THE COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 5 & 9)

Plaintiff Carrie E. Archambault is a claimant for Social Security Disability Insurance Benefits ("SSDI") and Supplemental Security Income ("SSI") under the Social Security Act. She brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to reverse the decision of the Social Security Commissioner that she is not disabled.[1] On March 15, 2016, Plaintiff moved for an order reversing the Commissioner's decision (Doc. 5). On June 17, 2016, the Commissioner moved to affirm (Doc. 9), whereupon the court took the pending motions under advisement.

Plaintiff identifies two errors in the Commissioner's decision: (1) the Administrative Law Judge ("ALJ") failed to adhere to the treating physician rule in evaluating the opinions of orthopaedic surgeon Dr. John Macy and psychiatrist Dr.

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Richard Edelstein which, in turn, caused other errors in the sequential evaluation of Plaintiff's claim; and (2) substantial evidence does not support certain findings by the ALJ, including his assessment of Plaintiff's credibility.

James Torrisi, Esq. represents Plaintiff. Special Assistant United States Attorney Jason P. Peck and Special Assistant United States Attorney Michelle L. Christ represent the Commissioner.

## I. Procedural History.

On May 10 and 13, 2010 Plaintiff filed for SSDI and SSI, respectively. In both applications, Plaintiff alleged a disability onset date of September 23, 2009. The Social Security Administration ("SSA") denied Plaintiff's application initially and on reconsideration. On January 25, 2011, Plaintiff filed a timely request for a hearing before an ALJ.

On July 2, 2012, an administrative hearing was held before ALJ Paul Martin, who issued a decision dated July 18, 2012, concluding that Plaintiff was not disabled within the meaning of the Social Security Act. Plaintiff subsequently appealed ALJ Martin's decision to this court. On September 23, 2014, Magistrate Judge John Conroy issued an Order concluding that ALJ Martin did not give good reasons for the weight afforded to the opinions of treating physicians Drs. Macy and Edelstein and remanding this matter to the Commissioner for further proceedings. On November 4, 2014, the Appeals Council issued a remand order in light of this court's decision, directing ALJ Martin to "offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision." (AR 908.)

On June 8, 2015, a hearing was held before ALJ Thomas Merrill. Plaintiff, who was represented by counsel, appeared and testified, as did vocational expert Christine E. Spaulding. On August 14, 2015, ALJ Merrill issued a decision finding that Plaintiff was not disabled. This stands as the Commissioner's final decision.

## II. Factual Background.

Plaintiff is a fifty-three-year-old right-handed woman. She was raised in Connecticut, and attended school through the eleventh grade. Her past relevant work

2

experience is as a food preparer and cook. At the July 2, 2012 administrative hearing, Plaintiff testified that she stopped working in 2009 because her "arm pain was getting really bad." (AR 962.) Plaintiff also testified that she splits her time between Canada and Vermont.

In October 2008, Plaintiff first sought treatment for one week of shoulder pain. At the time, she maintained a full range of motion with intact strength and sensation. She was treated with injections of Kenalog and Lidocaine, and in February of 2009 she was prescribed physical therapy after returning for treatment and showing signs of a decreased range of motion. An MRI in April of 2009 suggested a SLAP tear with cystic changes of the inferior glenoid. Thereafter, Plaintiff failed to attend physical therapy sessions on multiple occasions. In June of 2009, Plaintiff was referred to orthopaedist Dr. Bryan Huber, who performed an arthroscopic procedure to resurface Plaintiff's right shoulder. In September of 2009, Dr. Huber noted that Plaintiff had full passive range of motion with normal strength and minimal crepitus.

In January of 2010, Plaintiff again reported right shoulder pain; an MRI revealed degenerative changes. On February 1, 2010, Dr. Huber performed a second procedure on Plaintiff's right shoulder. Approximately three months later, albeit with limited use of her upper extremities, Plaintiff was able to complete her daily activities such as preparing meals, completing household chores, shopping in stores for an hour and a half, and driving a car with her left hand. Dr. Huber noted a marked improvement in Plaintiff's range of motion with episodic pain for which he recommended physical therapy.

On August 24, 2010, Dr. Huber reported that Plaintiff "was doing poorly postoperatively[,]" and was suffering "significant pain and discomfort." (AR 561.) He noted a clicking sound in Plaintiff's right shoulder as well as decreased range of motion. Plaintiff reported that she was using increased dosages of narcotics to manage her pain. Despite this, Plaintiff had been travelling, and an EMG test in September of 2010 showed only mild right median neuropathy. During an October 2010 meeting with Dr. John Lippman, Plaintiff indicated she was feeling well. Her treatment relationship with Dr. Huber ended in November 2010 when his office "was contacted by [Plaintiff's]

3

significant other who stated that [Plaintiff] was selling her narcotics." (AR 559.) At the time, Plaintiff did not have dysfunction of the left upper extremity.

In September of 2011, Plaintiff saw Dr. S. Glen Neale for evaluation of her right shoulder. Dr. Neale observed that Plaintiff had some pain with range of motion and referred her to Dr. John Macy. Dr. Macy evaluated Plaintiff in January of 2012, noted diffuse tenderness to palpation and pain with range of motion, and recommended total right shoulder arthroscopy. With respect to Plaintiff's left shoulder, Dr. Macy noted that Plaintiff had full, painless range of motion. Due to his concern about Plaintiff's use of narcotics, Dr. Macy refused to prescribe them, despite Plaintiff's request. On April 6, 2012, Dr. Macy performed a right shoulder replacement and revision right shoulder arthroplasty on Plaintiff. The procedure was effective in relieving Plaintiff's right shoulder pain, and Dr. Macy did not note any significant limitations of function in Plaintiff's left shoulder. By May of 2012, Plaintiff presented no unusual complaints, was not wearing a sling, and reported no tenderness to palpation. Dr. Macy observed that no swelling or deformity was present; the incision was well healed; sensation was intact to light touch; and Plaintiff's shoulder was vascularly intact. Plaintiff was able to ambulate effectively, and there was no weight bearing joint involved.

Three months after her surgery, Plaintiff reported that she had resumed activities of daily living, started exercising, attended physical therapy, and recently skinned her elbow while sliding down a waterslide at a party. Dr. Macy's physical examination recorded normal findings with no deformity and with sensation intact to light touch. He observed that Plaintiff's right shoulder was vascularly intact, and had full strength and no instability. Although Plaintiff reported mild postoperative pain, her pain was well controlled by ibuprofen. Examination of Plaintiff's left shoulder revealed no abnormalities. Dr. Macy subsequently cleared Plaintiff to return to a normal workload. At an August 2012 evaluation by Dr. John Lawlis, Plaintiff reported that she had done well with the surgery, and he observed she had pain-free range of motion with forward flexion to 160 degrees.

4

Plaintiff's medical records do not record any ongoing treatment for right shoulder pain in 2013. In 2014, Plaintiff reported that her right shoulder was "actually functioning quite well[,]" and that her pain was "much better than it was" prior to her surgery. (AR 1022.) She reported left shoulder pain, but maintained flexion to 145 degrees. An MRI showed a small area of change, but Plaintiff's symptoms remained tolerable. During this time period, Plaintiff was travelling back and forth to Canada.

Approximately fourteen years prior to her alleged onset date, Plaintiff was diagnosed with a rare lung disease known as pulmonary Langerhans histiocytosis. Dr. Nicole Hynes, a Rheumatologist to whom Plaintiff was referred in August of 2009 for a possible association between that condition and Plaintiff's shoulder pain, noted that despite this condition, "[Plaintiff] has felt relatively well and continues to smoke." (AR 326.) In January of 2011, pulmonary specialist Dr. Veronika Jedlovsky observed that Plaintiff had no wheezing, and in April of 2011, further noted that a concerning lesion on Plaintiff's lung was decreasing in size. In July of 2012, Dr. Jedlovsky reevaluated Plaintiff and observed that she had clear breath sounds and improvement in the nodule in her lung.

In addition to her physical impairments, Plaintiff suffers from anxiety, panic attacks, and depression. Plaintiff testified at the June 8, 2015 administrative hearing that she experienced panic attacks two to three times per week. In her initial function report, dated May 27, 2010, Plaintiff reported no mental health effects and stated she was social in person and on the phone; able to shop at stores for an hour and a half; travelled places without needing accompaniment or reminders; had no problems getting along with family, friends, neighbors, or others; could pay attention as long as necessary (unless she was taking medications); finished what she started; did well with written instructions; was good with oral directions unless it involved directions for travelling to unfamiliar places; got along well with authority figures; was never fired or laid off from employment due to problems dealing with others; and was able to handle changes in routine. She noted that she was "not good right now" with stress, but that she was taking medication. (AR 270.)

5

On October 25, 2010, Plaintiff sought mental health treatment for the first time. Her presenting problem was an abusive boyfriend, and she reported that "it feels everything is crashing around her in her life[.]" (AR 591.) The evaluator noted that although Plaintiff had appropriate affect and mood, she picked at and rubbed her arms during the session. The evaluator further observed that Plaintiff did not appear to be distracted, and her memory, insight, and judgment "appeared to be in line with her estimated level of intelligence[,] which is said to be in the average range." (AR 593.) Plaintiff was diagnosed with anxiety disorder and adjustment disorder with mixed anxiety and depression and prescribed Celexa for her depression. The next month, a caseworker filled out a function report and noted that Plaintiff's memory, ability to complete tasks, and concentration were affected, but that Plaintiff was nevertheless able to finish what she started.

On December 1, 2010, Dr. Edelstein performed a psychiatric evaluation of Plaintiff, who complained that "I feel like I'm here but I'm out somewhere else. I'm always depressed." (AR 600.) Plaintiff reported panic attacks that had "the feeling of having a heart attack," and that she "[felt] scared all the time." *Id.* Plaintiff advised Dr. Edelstein that she had only started having the panic attacks since breaking up with her boyfriend three months earlier. Dr. Edelstein noted that Plaintiff was friendly and cooperative, with a full range of affect, although her mood was "slightly downcast" and she was "a bit fidgety[.]" (AR 601.) Dr. Edelstein assessed Plaintiff as a "47-year-old woman with a history of childhood and adult abuse with a long history of chronic depression, presenting now with exacerbation of depressive symptoms and . . . panic attacks since [a] relationship breakup [three] months ago. Symptoms persist despite current medication treatment." (AR 601-02.) Dr. Edelstein diagnosed Plaintiff with dysthymia, panic disorder without agoraphobia, and post-traumatic stress disorder ("PTSD"). He assessed a Global Assessment of Functioning ("GAF")[2] score of "55 to

---

[2] "The GAF was a scale promulgated by the American Psychiatric Association ("APA") to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n,

6

60." (AR 601.) To treat Plaintiff's symptoms, Dr. Edelstein increased her dosage of Celexa.

During a visit with Dr. Edelstein on December 29, 2010, Plaintiff advised that she was doing very well and was "elated" due to the recent birth of her granddaughter. (AR 623.) Plaintiff reported that her mood "has been generally better with [the] higher dose of Celexa." *Id.* She reported that a male friend was visiting from Canada. She continued scratching her arms, however.

Plaintiff continued to see Dr. Edelstein throughout 2011. She recounted that she and her boyfriend took trips to Canada, which had gone very well; they got engaged; and her lung tumor shrank. Although she reported some ongoing anxiety, including having "panic attacks while on [a] long drive[,]" Dr. Edelstein concluded that Plaintiff was "doing well[.]" (AR 618.) Plaintiff requested Valium to address her panic attacks, but Dr. Edelstein instead prescribed a higher dose of Ativan. Over the course of 2011, Dr. Edelstein described Plaintiff as pleasant, calm, and cooperative. He recorded that he did not observe her to suffer from anxiety.

On March 29, 2012, Plaintiff reported that her mood was "ok[,]" and medications were helping with her anxiety. (AR 678.) Dr. Edelstein noted that Plaintiff's mental status was stable and that she was doing well. On June 12, 2012, Dr. Edelstein completed a functional assessment of Plaintiff in which he opined that Plaintiff suffered episodes of decompensation every one to two months and marked deficiencies in concentration, pace, or persistence as a result of her mental impairments. He indicated that she had "none to slight" restrictions in activities of daily living. He further opined that Plaintiff would miss three days of work per month due to anxiety and panic attacks.

Eight months later, Plaintiff saw Dr. Edelstein after a long visit to Canada. She reported that she had run out of medication and advised Dr. Edelstein that she was particularly anxious. Dr. Edelstein noted that Plaintiff was "somewhat sad" during their

---

*Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereafter the "Manual")). The GAF scale has been removed from the latest version of the Manual. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

session, but that her memory and concentration were intact. (AR 1109.) Plaintiff thereafter resumed her medications. On September 4, 2013, Plaintiff again presented to Dr. Edelstein reporting that she had been off her medications for months while in Canada. Plaintiff reported being much more anxious and depressed, stating that she "cries at the drop of a hat." (AR 1113.) Dr. Edelstein noted that Plaintiff appeared much more anxious during their session, but had coherent and logical speech and intact memory and concentration.

On January 29, 2014, Plaintiff returned to Dr. Edelstein, reporting increased anxiety, which she attributed in part to living with a friend while in Vermont. Plaintiff stated that her friend's house was "such a mess that [she] is very uncomfortable there." (AR 1115.) Plaintiff further stated that she would drink with the friend, sometimes consuming a six-pack of beer in four to five hours. Dr. Edelstein noted that Plaintiff appeared to be mildly anxious during their session, and that her reported anxiety could be related to her alcohol consumption combined with her benzodiazepine use. He recorded Plaintiff's mental status as otherwise normal.

By their next meeting a month later, Plaintiff reported that she was "feeling better" and that the increased dosage of Ativan was helping with her anxiety. (AR 1117.) However, on May 27, 2014, Plaintiff reported that she was experiencing daily panic attacks that "come out of the blue[,]" in which "[s]he gets [shaky], sweaty, heart racing, feels fearful." (AR 1119.) Dr. Edelstein nonetheless noted that Plaintiff presented as calm with a full range of affect, euthymic mood, coherent and logical speech, no distortions of reality, fully oriented, good judgment and insight, and with her memory and concentration intact. During sessions in the fall of 2014, Plaintiff reported feeling significant anxiety and informed Dr. Edelstein that she was considering leaving her husband. She advised that she was planning to move in with family in the Burlington area.

In October and November of 2014, Plaintiff met with Licensed Clinical Mental Health Counselor ("LCMHC") Gretchen Lewis for substance abuse treatment. Ms. Lewis noted that Plaintiff abused alcohol, but did not report any panic attacks or observed

8

anxiety. Plaintiff presented with good eye contact, grooming, and posture; normal thought content and intact thought process; adequate insight and judgment; and no suicidal or homicidal ideation.

On January 30, 2015, Plaintiff was admitted into a three-week inpatient treatment program for poly-substance abuse at Valley Vista rehabilitation center. On admission, Plaintiff tested positive for benzodiazepines and oxycodone, and had a blood alcohol content of .176. Plaintiff was diagnosed with alcohol dependence, sedative dependence, and PTSD with secondary anxiety/panic. ALJ Merrill noted that Plaintiff "participated minimally" in this program during which "[t]here was no report of panic attacks or observed anxiety." (AR 814.)

On May 15, 2015, Dr. Edelstein wrote a letter to Plaintiff's counsel in which he opined that Plaintiff "remains disabled in the manner I indicated to you in my reports dated June, 21, 2012." (AR 1154.) Dr. Edelstein stated that since that time, Plaintiff's anxiety had gotten "somewhat worse[,]" and that "she continues to be particularly anxious when riding in vehicles." *Id.* Dr. Edelstein further opined that "although [Plaintiff] maintains attention during our short sessions (20 minutes), she would have difficulty sustaining attention for the longer time spans that work would require, due to anxiety around others." *Id.*

### III. ALJ Merrill's Application of the Five-Step, Sequential Evaluation Process.

In order to receive SSDI or SSI benefits, a claimant must be disabled on or before his or her date last insured. SSA regulations set forth the following five-step, sequential evaluation process to determine whether a claimant is disabled:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

9

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Merrill determined that Plaintiff's last date insured was March 31, 2013, and that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 11, 2009. (AR 810.) At Step Two, ALJ Merrill found that Plaintiff had a single severe impairment: "osteoarthritis of the right shoulder status post total joint replacement surgery[.]" *Id.* Although Plaintiff's medical records evidenced "several lesions in Plaintiff's lungs," *id.*, ALJ Merrill concluded that her pulmonary Langerhans histiocytosis was not a severe impairment because there were "no indications of ongoing symptoms for any 12-month period[.]" *Id.* ALJ Merrill further concluded that Plaintiff had no severe mental health impairments. He observed that she had no more than mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace, and that she "experienced no episode of decompensation of extended duration." (AR 813.)

At Step Three, ALJ Merrill determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any listed impairment. At Step Four, ALJ he concluded that Plaintiff had the residual functional capacity ("RFC") to "perform light work as defined as in [20 C.F.R. § 404.1567(b)] and [20 C.F.R. § 416.967(b)] except that she is limited to occasional pushing/pulling with the upper extremities and occasionally reach overhead with her upper extremities." (AR 816.) Although non-severe, ALJ Merrill considered Plaintiff's pulmonary Langerhans histiocytosis and mental health impairments in determining her RFC. Based on

Plaintiff's RFC for light work with the identified limitations, ALJ Merrill determined that Plaintiff was not capable of returning to past relevant work.

At Step Five, ALJ Merrill determined, based on vocational expert Spaulding's testimony,[3] that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" (AR 822), and was for that reason not disabled.

### IV. Conclusions of Law and Analysis.

#### A. Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

---

[3] Vocational expert Spaulding testified that if Plaintiff was limited to light work with some restrictions, she could perform work as a cashier, "collator operator[,]" or a price marker. (AR 851-52.) Vocational expert Spaulding further testified that if Plaintiff were limited to sedentary work, there would be only two jobs in the national and regional economies Plaintiff could perform, "surveillance system monitor" and "call-out operator[.]" (AR 852-53.)

11

## B. Whether ALJ Merrill Erred by not Incorporating Limitations Found by ALJ Martin into his RFC Determination.

As a threshold issue, Plaintiff contends that the Commissioner's decision is not supported by substantial evidence because ALJ Merrill's RFC determination did not include the mental health limitations noted by ALJ Martin in 2012. ALJ Martin determined that Plaintiff had the RFC perform light work with the following additional limitations:

> [S]he is limited to lifting and carrying up to five pounds maximum with the right upper extremity. She can perform overhead work on less than an occasional [basis], or [for] short, brief, occasional times per day, but generally speaking no overhead work. In general, she can perform no reaching forward. Objects will need to be kept close to the body. She has no difficulty otherwise with manipulation. [Plaintiff] can perform pushing and pulling occasionally. She can never climb ladders, ropes, or scaffolds. *[She] is limited to groups of less than ten; she cannot work in large crowds. She has the ability to interact with supervisors and coworkers and the general public. She can adapt to routine work environments and make simple decisions. She can understand, remember, and carry out moderately complex tasks.* [Plaintiff] also should have no concentrated exposure to temperature extremes, particularly heat, as well as fumes, dusts, and gases.

(AR 866) (emphasis supplied).

On remand, ALJ Merrill was directed to conduct a new hearing and issue a new decision in accordance with the court's determination that "the ALJ did not give 'good reasons' for the weight afforded to Dr. Macy's and Dr. Edelstein's treating physician opinions." (AR 904.) The Second Circuit has recognized that contrary rulings from two ALJs, even based on the same record, may be affirmed if supported by substantial evidence. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 127 (2d Cir. 2012) (opining that the fact that two different ALJs reached different conclusions based on the same record does not "bolster [a claimant's] claim that [one of the decisions] was not supported by substantial evidence") (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). As a result, ALJ Merrill's decision is not "legally erroneous" to the extent that Plaintiff's RFC is less restrictive than was previously determined by ALJ Martin.

## C. Whether ALJ Merrill Failed to Properly Evaluate Treating Source Opinions.

Plaintiff contends that ALJ Merrill failed to evaluate the medical opinions of Dr. Macy and Dr. Edelstein pursuant to the "treating physician rule." In June 2012, Dr. Macy opined that Plaintiff had limited strength and range of motion in her right shoulder. He further opined that Plaintiff would miss more than four days of work per month due to "limited strength [and] endurance[,]" but noted that Plaintiff's condition "may improve over time." (AR 796.) The same month, Dr. Edelstein opined that Plaintiff would miss three days of work each month due to anxiety disorder and panic attacks. Plaintiff contends that ALJ Merrill's failure to accord controlling weight to Dr. Macy's and Dr. Edelstein's opinions led to the erroneous determinations that she did not suffer from a severe mental health impairment at Step Two, and did not have any mental limitations at Step Four. The Commissioner responds that ALJ Merrill provided good reasons for the weight accorded to the opinions in question and that the record as a whole supports his conclusions.

"[T]he [Social Security Administration] recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]" *Burgess*, 537 F.3d at 128 (internal quotation marks omitted). Under the treating physician rule, the opinions of treating physicians are "binding if . . . supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418. To weigh the opinion of a treating physician, an ALJ must consider, among other things, the length, frequency, nature, and extent of the treatment relationship; the consistency of the opinion offered with the "record as a whole"; and whether the opinion is "of a specialist about medical issues related to his or her area of specialty[.]" 20 C.F.R. §§ 404.1527(c)(2), (4), (5) & 416.927(c)(2), (4), (5). An ALJ is "required either to give [the opinions of a claimant's treating physician] controlling weight or to provide good reasons for discounting them." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

13

### 1. Dr. Edelstein's Opinions.

After observing that "[t]here are no notations of concentration, persistence[,] or pace problems" in Dr. Edelstein's treatment records and that his "subsequent records specifically report that [Plaintiff] has intact memory and concentration[,]" ALJ Merrill gave "[n]o weight" to Dr. Edelstein's opinion that Plaintiff suffered from "marked limitation[s]." (AR 813.) In so ruling, ALJ Merrill correctly reasoned that Dr. Edelstein's opinion that Plaintiff "would have difficulty sustaining attention for the longer time spans that work would require, due to anxiety around others[,]" (AR 1154), was inconsistent with his own treatment notes, which did not contain those limitations.

ALJ Merrill further noted that although Dr. Edelstein assessed Plaintiff with a GAF score indicative of moderate limitations in functioning, because GAF scores "are so general that they are not useful without additional supporting description and detail[,]" *Mainella v. Colvin*, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014), ALJs "[are] free to discount . . . opinions in favor of a broader view of the medical evidence" when there were inconsistencies in a treating physician's opinion. *Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008); *see also* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (directing that "the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion.").

ALJ Merrill also found that Dr. Edelstein's treatment notes did not support his opinion that Plaintiff had episodes of "deterioration or decompensation" that lasted "less than [two] weeks duration but of greater frequency than [one] every [four] months[.]" (AR 798.)[4] As ALJ Merrill observed, the only evidence of panic attacks in Dr.

---

[4] In determining Plaintiff's RFC, ALJ Merrill relied on the 2010 assessments of state agency psychologists Edward Hurley, Ph.D., and Joseph Patalano, Ph.D., who opined that Plaintiff did not have episodes of decompensation of extended duration, to support his decision. Although the opinions are dated and neither Dr. Hurley nor Dr. Patalano examined Plaintiff, these opinions are consistent with Dr. Edelstein's treatment notes. Thus, ALJ Merrill did not err by according them great weight, and a remand is not required on this basis. *See Lauber v. Colvin*, 2015 WL 4600356, at *7 (W.D.N.Y. July 29, 2015) (concluding that the ALJ did not err in according great weight to the opinion of a consultative psychologist where "the consultative psychologist's opinion was more consistent with the underlying medical evidence and [the treating psychologist's] clinical examination results").

Edelstein's treatment notes derive from Plaintiff's subjective reports, which noted panic attacks attributed to her long drives to Canada, non-work relationships, and housing situation in Vermont. Those notes reveal that Plaintiff's symptoms were generally adequately treated with medication and that Plaintiff experienced the most severe symptoms when she was not medication compliant. LCMHC Gretchen Lewis, who treated Plaintiff for substance abuse from October 2, 2014 through November 5, 2014, did not document either panic attacks or anxiety in her treatment notes. In addition, Plaintiff advised both Dr. Edelstein and her primary care provider, Dr. Lippman, that medication worked well to control her anxiety, and she complained of increased symptoms only when she ran out of medication during visits to Canada. Notes from the facility where she sought substance abuse treatment likewise reveal no episodes of panic attacks or anxiety. Dr. Edelstein's treatment notes concede that Plaintiff's alcohol and benzodiazepine abuse "could be exacerbating her anxiety." (AR 1115.)

Because ALJ Merrill provided "good reasons" for attributing partial weight to Dr. Edelstein's opinion that Plaintiff would have episodes of decompensation that lasted less than two weeks but of greater frequency than one every four months and because his treatment notes do not support the other limitations he found, a remand is not required. ALJ Merrill considered Plaintiff's mental impairments in his RFC analysis, noting that her "medically determinable impairments were taken into consideration along with [Plaintiff's] 'severe' impairments in finding [Plaintiff's] residual functional capacity[.]" (AR 815); *see O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) ("Because this condition was considered during the subsequent steps, any error was harmless."); *see also Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (concluding any error by ALJ in excluding plaintiff's mental health issues from his Step Two analysis was harmless where the ALJ "specifically considered" those conditions "during the subsequent steps"); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding no error where, "contrary to [plaintiff's] argument, the ALJ's decision makes clear that he considered the 'combination of impairments' and the combined effect of 'all symptoms' in making his determination.").

Finally, as ALJ Merrill noted, Plaintiff alleged disability due to her physical limitations. *See Sellers v. Heckler*, 590 F. Supp. 1141, 1146 (S.D.N.Y. 1984) (noting that "plaintiff's mental impairment, if any, was not raised in her initial application[,]" in determining that the record did not support a conclusion that plaintiff suffered from a severe mental impairment). Because the ALJ's decision to accord partial weight to Dr. Edelstein's opinions was supported by substantial evidence, and because the ALJ considered all of Plaintiff's alleged impairments in his RFC analysis, any error in failing to characterize Plaintiff's mental impairments as severe was harmless.

### 2. Dr. Macy's Opinions.

ALJ Merrill assigned partial weight to the opinions of Plaintiff's orthopaedic surgeon, Dr. Macy. In making this determination, ALJ Merrill observed that:

> The possibility always exists that a doctor may express an opinion in the effort to assist a patient with whom he or she sympathizes for one reason or another. Patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(AR 819.) The court agrees with Plaintiff that the ALJ's observation is speculative and does not constitute a good reason for disregarding Dr. Macy's opinions. "In choosing to reject [a] treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion.*" *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (internal quotation marks omitted); *see also Payton v. Colvin*, 632 F. App'x 326, 327 (9th Cir. 2015) (noting that the ALJ "speculated that the treating physicians supported [plaintiff's] application for benefits out of sympathy or to avoid tension with her[,]" in concluding that the ALJ did not provide good reasons for rejecting a treating physician's opinion). However, ALJ Merrill further observed that Dr. Macy

16

rendered his opinions two months after he performed a total replacement of Plaintiff's right shoulder, and his subsequent treatment notes document a substantial improvement in Plaintiff's condition. In July 2012, Plaintiff reported only "mild postoperative pain" that was "well controlled on Ibuprofen[,]" (AR 1156), and Dr. Macy cleared Plaintiff to "resume normal workload." (AR 1157.) By 2014, Plaintiff advised Dr. Macy that her right shoulder was "actually functioning quite well[,]" and that her right shoulder pain was "much better than it was" prior to her surgery. (AR 1022.)

Although ALJ Merrill's analysis of Dr. Macy's opinions could have been more comprehensive with respect to the medical record prior to Plaintiff's April 6, 2012 shoulder replacement,[5] he adequately explained why he accorded partial weight to Dr. Macy's opinions, including the inconsistencies between those opinions and his treatment notes. *See Botta v. Colvin*, 2016 WL 6117724, at *1 (2d Cir. Oct. 19, 2016) (affirming district court judgment dismissing plaintiff's disability insurance benefits claims in part because "the ALJ applied the substance of the treating physician rule and provided good reasons for her decision not to give [the treating physician's] opinion controlling or significant weight.") (internal quotation marks omitted).

### D. Whether ALJ Merrill's Adverse Credibility Finding is Supported by Substantial Evidence.

Finally, Plaintiff contends that ALJ Merrill's conclusion that she was not wholly credible is not supported by substantial evidence because ALJ Merrill erroneously found that she had "a history of abusing and selling narcotic medication[,]" (AR 814), and that she drove to Canada. Plaintiff points to her strong work history prior to her alleged onset date and the aggressive treatment she pursued for her right shoulder condition. *See Rivera v. Schweiker*, 717 F. 2d 719, 725 (2d Cir. 1983) (observing that "[a] claimant with

---

[5] Plaintiff's contention that "ALJ Merrill should have found a different RFC for different time periods[,]" (Doc. 5-1 at 5), is unpersuasive. ALJ Merrill determined that Plaintiff's shoulder condition did not meet or equal the requirements of listing 1.02 in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings") during any twelve-month period. Additionally, in his RFC analysis, ALJ Merrill cited treatment notes from the period prior to Plaintiff's shoulder replacement surgery, observing that she "had full passive range of motion with normal strength and minimal crepitus[,]" had been travelling to Canada, and was "selling her narcotic medications." (AR 818.) ALJ Merrill thus properly considered the entire disability period.

17

a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."). The Commissioner responds that the totality of the objective medical evidence does not corroborate Plaintiff's subjective symptomatology to the extent alleged.

Under the Social Security Act, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability[.]" 42 U.S.C. § 423(d)(5)(A). 20 C.F.R. § 404.1529(c)(3) sets forth seven factors that are relevant in assessing credibility: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment, other than medication, used for relief of pain or other symptoms; (6) any measures used to alleviate pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.

"It is the function of the [ALJ], not [the court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the [plaintiff]." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The ALJ may thus weigh "the objective medical evidence in the record, the [plaintiff's] demeanor, and other indicia of credibility," in determining whether to credit the plaintiff's testimony. *Pascariello v. Heckler*, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985). "If the [ALJ's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte*, 728 F.2d at 591 (internal citations omitted). However, "[a] finding that [a] witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988); *see also* SSR 96-7P, 1996 WL 374186, at *4 (July 2, 1996) ("When evaluating the credibility of an individual's statements, the [ALJ] must consider the entire case record and give specific reasons for the weight given to the individual's statements.").

"[S]ubstance abuse is one of many factors an ALJ may consider when evaluating a claimant's credibility." *Blasco v. Comm'r of Soc. Sec.*, 2014 WL 3778997, at *4

18

(N.D.N.Y. July 31, 2014). As the Commissioner correctly observes, the medical record reveals Plaintiff had a significant history of substance abuse, which Dr. Edelstein noted could be the cause of her reported anxiety. In addition, on November 9, 2010, Dr. Huber advised Plaintiff "to seek further care at another facility" because her former boyfriend reported that she was selling her narcotic medications. (AR 559.) On January 10, 2012, Dr. Macy noted that "[t]here is a concern for [n]arcotic abuse and [Plaintiff] selling [narcotics]." (AR 632.) He noted that Plaintiff requested more narcotics, to which he responded, "[neither] I nor anyone in this office will be prescribing her narcotics." *Id.* On admission to Valley Vista rehabilitation center in January 2015, Plaintiff tested positive for benzodiazepines and oxycodone, and had a blood alcohol content of .176. Thus, to the extent that ALJ Merrill considered Plaintiff's substance abuse in determining her credibility, his decision to do so was consistent was applicable legal standards and supported by substantial evidence.

Plaintiff's argument that ALJ Merrill erroneously concluded that she drove to Canada is similarly unpersuasive. Plaintiff's ability to travel to Canada was only one aspect of his credibility determination. ALJ Merrill also determined that Plaintiff's subjective complaints were not credible to the extent alleged because "[t]he objective evidence in this claim falls short of demonstrating the existence of pain and limitations that are so severe that [Plaintiff] cannot perform any work on a regular and continuing basis." (AR 817.) In support, ALJ Merrill noted that Plaintiff had resumed activities of daily living following the April 6, 2012 shoulder replacement, and that subsequent treatment notes indicated that her right shoulder was "actually functioning quite well[.]" (AR 1022.) He also properly pointed out that she was able to partake in long car rides without symptoms in her shoulders. Under Social Security Ruling 96-7P, medical evidence that "demonstrate[s] worsening or improvement of the underlying medical condition . . . may [] help an adjudicator to draw appropriate inferences about the credibility of an individual's statements." SSR 96-7P, 1996 WL 374186, at *6; *see also* 20 C.F.R. § 404.1529(c)(2) (noting that "[o]bjective medical evidence . . . is a useful indicator to assist [the ALJ] in making reasonable conclusions about the intensity and

persistence of [a claimant's] symptoms and the effect those symptoms . . . may have on [his or her] ability to work.").

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). The ALJ "is not required to accept [Plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* Accordingly, although the court may have reached a different conclusion, ALJ Merrill's determination that Plaintiff was not fully credible was supported by substantial evidence. *See Aponte*, 728 F.2d at 591.

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for an Order reversing the Commissioner's decision (Doc. 5) and GRANTS the Commissioner's motion to affirm (Doc. 9).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 17th day of November, 2016.

Christina Reiss, Chief Judge
United States District Court